FILED
JAMES J. VILT, JR. - CLERK

MAY 24 2023

U.S. DISTRICT COURT
WEST'N. DIST. KENTUCKY

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION

---

CLETUS K. OPPONG, M.D.          :      **COMPLAINT FOR A CIVIL CASE**
(PLAINTIFF)
                                :      CASE NO.  4:23-CV-73-GNS
V.                              :

OWENSBORO HEALTH MEDICAL GROUP INC :   JURY TRIAL:      ■ Yes
(DEFENDANT)

                                :      MAY 22, 2023

**VERIFIED COMPLAINT**

Comes now the Plaintiff, CLETUS K. OPPONG, by undersigned as pro se, and for his Complaint would show as follows:

Introduction

This lawsuit seeks justice for Dr. Oppong pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e et seq., and to remedy acts of employment discrimination and retaliation perpetrated against him by Owensboro Health Medical Group ("OHMG"). Dr. Oppong was an enthusiastic, committed Black doctor who worked as a physician at OHMG in Owensboro, Kentucky. Where Dr. Oppong sought professional development and career advancement opportunities, he instead encountered racial prejudice, discrimination based on race (African-American) or national origin (Ghanaian), and a hostile work environment.

1

## Jurisdiction

1.    This Court has jurisdiction over this matter pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-16, pursuant to 28 U.S.C. §§ 1331, 1343(4) and 28 U.S.C. §§ 2201 and 2202. This lawsuit is brought pursuant to the "The Civil Rights Act of 1866," 42 U.S.C. § 1981, and 1981a and The Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., as amended by the Civil Rights Act of 1991. Equitable and other relief is sought under 42 U.S.C. 2000e-5(g).

## Venue

2.    Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(1) and 28 U.S.C. § 1391(b)(2) because one or more defendants reside in this judicial district and all defendants are residents of the State of Kentucky; and under 42 U.S.C. Section 2000e-5(f)(3) and 5, as Dr. Oppong was employed by OHMG at all relevant times, Dr. Oppong's employment records are maintained by OHMG in this judicial district, and decisions adverse to Dr. Oppong's employment that are the subject of this civil action were made in this judicial district. Additionally, a substantial part of the events or omissions giving rise to this claim occurred within this judicial district.

## Parties

3.    Plaintiff, Cletus Oppong, M.D., MPH., is a male adult Occupational Medicine Physician of African American heritage who resides in Utica, Kentucky. Dr. Oppong may be contacted through email at cletus.oppong@gmail.com or telephone at 678-510-3756 or by mail to 2272 Meadowhill Lane, Utica, KY 42376.

4.    Defendant Owensboro Health Medical Group (OHMG) is an integrated healthcare corporate entity organized as a non-profit corporation under the laws of the State of Kentucky and located in Western Kentucky and Indiana.

## Factual Allegations

5.    Getting to the end of his residency at West Virginia University, Dr. Oppong applied, interviewed for, and was offered, the position of Occupational Medicine Physician at OHMG.

6.    Dr. Oppong accepted the Occupational Medicine Physician position on December 20, 2019, and signed a formal employment agreement on January 20, 2020. **(Dr. Oppong's Employment Contract with OHMG, Exhibit 1)**.

7.    Dr. Oppong was employed by OHMG as an Occupational Medicine Physician for an initial 2 Year Contract, running from August 1, 2020, to August 1, 2022, at 2211 Mayfair Avenue, Owensboro, Kentucky.

8.    The contract was signed on behalf of OHMG by Greg Strahan, President, and CEO of OHMG.

3

9.    Later, Jennifer Flaherty, Manager at OHMG, signed the Contract Cover Sheet. **(Signed Contract Cover Sheet, Exhibit 2)**.

10.    OHMG had actual knowledge of Dr. Oppong's race and/or constructive knowledge of Dr. Oppong's national origin when it hired him.

11.    OHMG had actual knowledge of Dr. Oppong's race and of his national origin when Dr. Oppong completed an I-9 and physically started working at OHMG on August 1, 2020, a little over one month after he completed his medical school residency in June, 2020.

12.    Upon information and belief, OHMG did not issue an employee handbook to Dr. Oppong or give him specific training when he began working at OHMG.

13.    OHMG had a system called Health Stream which is where employees did all their work-related or administrative onboarding, so that if there was an in-service or something that needed to be done, it would get pushed to selected persons.

14.    So, as long as an employee was compliant with the general policies, nobody focused on the specific regulations and laws. As part of the benefits package given to Dr. Oppong when he went to Human Resources at OHMG's business office to obtain his work badge, he sat down with Leisa Allen and reviewed the available benefits and selected the Federal Savings Account ("FSA"). **(FSA, set up by OHMG benefit manager around June 2021, for employment start date of 8/1/2020)**.

4

15.   No physical employee handbook or manual was provided to Dr. Oppong upon being hired at OHMG.

16.   Instead, Dr. Oppong was provided with timelines.

17.   Dr. Oppong was not given any situational awareness of specific grievance procedures.

18.   The ad hoc practice was to go to Dr. DuFrayne, the Chief Medical Officer for resolution of any employment related issues.

19.   When Dr. Oppong started working, he was not told that Health Equity was his benefits administrator, because his Federal Savings Account was not set up for over five months afterwards.

20.   Dr. Oppong's FSA was set up only after he complained.

21.   So, in treatment different than that accorded to other employees, Dr. Oppong's FSA was not set up for months, to his detriment, until he reached out to Jason Fields who got alarmed and got on Human Resources to immediately fix the problem.

22.   About five or six months after he started at OHMG, Dr. Oppong discovered that his FSA Account had not been created, even though he had set up all the prerequisites.

23.   So, Dr. Oppong called Human Resources personally but some random customer service representative was extremely rude and unhelpful.

24.   Dr. Oppong contacted the practice manager but could get no meaningful resolution.

25. Fed up with being harassed, Dr. Oppong called Jason Fields, OHMG's Chief Operating Officer who was in charge of all operations, and who was also an attorney.

26. Jason Fields agreed to send an email to someone in Human Resources and instantly the issue regarding no FSA Account was fixed.

27. At the OHMG Office, there were approximately nine or ten employees, including Practice Manager Danny Hagan, Dr. Oppong's colleague Dr. Gayle Rhodes, his wife Physician's Assistant Aida Rhodes, and support staff.

28. Danny Hagan was in charge of daily operations.

29. Dr. Rhodes was in charge of the specific office where Dr. Oppong worked primarily.

30. Physician's Assistant Aida Rhodes barely interacted with Dr. Oppong. When she came into the office, she went straight into her husband's office, or went to the Urgent Care Unit.

31. Dr. Oppong was the only African American person in that OHMG Office.

32. As part of his duties Dr. Oppong saw patients and monitored and supervised everybody else.

33. As part of his duties, Dr. Oppong traveled once a week to Hawesville, and twice a month to Leitchfield, to conduct additional assorted OHMG duties, including seeing patients.

34.    As part of this role, Dr. Oppong began supervising Ashley Flener, a nurse practitioner in OHMG's Leitchfield Office in June 2021. **(Nurse Practitioner Supervisory Agreement, Exhibit 4).**

35.    Dr. Oppong was repeatedly asked in October 2021 by Danny Hagan, the OHMG Practice Manager, to backdate Advanced Practice Clinician ("APC") contract forms to Dr. Rhodes. **(Complaints to Danny Hagan about backdating APC forms, Exhibit 5).**

36.    Dr. Oppong was also given unethical requests to change medical review officer determinations by Account Executives, including Kelly Conner. **(Communication related to complaint about drug screen result, Exhibit 6).**

37.    When Dr. Oppong told Danny Hagan that he hadn't been getting the paperwork, Danny Hagan proceeded to print three or four months worth of forms and asked Dr. Oppong to sign and backdate them, although illegal and unethical to do so.

38.    Dr. Oppong hesitantly signed the APC contract forms for his supervisory role and explained that Dr. Rhodes got his forms in a timely manner, and that Dr. Oppong would not continue to jeopardize his hard-earned medical license to back-date the paperwork which should have been delivered to him via mail as was done to Dr. Rhodes on time monthly. **(Complaints to Danny Hagan about unfair treatment, Exhibit 7).**

39.    Danny Hagan thought that as OHMG was paying $500 a month to fill the forms, Dr. Oppong would do it because he could use the

extra money, but Dr. Oppong said that no, he did not want any extra money, as this behavior would jeopardize his license.

40.    Dr. Oppong drew Danny Hagan's ire when in December 2021 he asked to be taken off the role of directly supervising Ashley Flener, due to the pressure to back-date her papers.    **(Rescission from supervisory role, Exhibit 8).**

41.    Danny Hagan brought the paperwork and Dr. Oppong removed himself from a supervisory role, although he continued to assist Ashley Flener as necessary with unrelated work assignments such as signing for durable medical equipment, since nobody else at that satellite office was qualified to sign for those items.

42.    Dr. Oppong mentioned the anomaly of being pressured to back-date forms to Dr. Rhodes.    **(Notice to Danny related Dr.Oppong's complaint to Dr. Rhodes, Exhibit 9).**

43.    Dr. Oppong would seek permission from Dr. Rhodes to go to lunch and while he was gone to lunch, OHMG office staff would slip charts in his office, then subsequently falsely claim that he had gone of to lunch while patients were waiting to be attended to.

44.    Dr. Oppong had to go to Danny Hagan's office several times to try to address the issue of patient's charts being surreptitiously stuck in his office while he was out to lunch. **(Complaints to Danny Hagan about charts for patients placed in office while out to lunch, Exhibit 10).**

8

45.    The practice of putting patients charts in Dr. Oppong's room with the door shut was so he could be accused of having abandoned patients to go off to lunch, and Dr. Oppong realized that this harassment was being done not only on account of his race, but also in retaliation for him refusing to backdate forms.

46.    Due to this hostility at work, Dr. Oppong did not socialize with his coworkers. He would go in, see his patients, and then retreat to his home, as the workplace environment felt hostile.

47.    However, Dr. Oppong stuck it out to fulfill his contract.

48.    On January 1, 2022, OHMG implemented a new 403(b) Safe Harbor Plan Summary of Material Modification.  (**New 403 (b), Exhibit 11**).

49.    This new 403(b) Safe Harbor Plan changed the vesting method from actual hours to elapsed time, effective on January 1, 2022. Per OHMG, the period of vesting was thus changed to grant matching employer contribution only for each twelve-month calendar year ending on December 31.  But this interpretation by OHMG of the new 403(b) Safe Harbor Plan is in conflict with the actual policy which states on its face, on the SUMMARY OF MATERIAL MODIFICATION, that, **Pertaining to Period of Service, "You will be credited a Period of Service for each twelve-month period from your date of hire until the date of your employment terminates".** **(See Exhibit 11, Cover Page, and ARTICLE V – VESTING).**

9

50.    The change exempted employees who terminated their employment before December 31, 2021.

51.    Dr. Oppong's supervisors treated him disparately and tried to stunt his professional development on account of his being Black and from Ghana.

52.    Dr. Oppong was singled out for racially disparate treatment by repeatedly being assigned active patient charts during his authorized lunch breaks, despite having been told that such lunch periods would be covered by Dr. Rhodes.

53.    OHMG supervisory staff colluded in using their authority to systematically marginalize him and to unsuccessfully induce him to engage in unethical or unprofessional practices such as backdating official documents and State of Kentucky mandated medical records.

54.    Dr. Oppong felt trapped in the role assigned to him at OHMG.

55.    The pervasive and continuing behavior and/or policies impeded Dr. Oppong's ability to perform his job because of the level of hostility and discomfort.

56.    As a consequence of such ongoing harassment and disparate treatment by racial animus, Dr. Oppong felt such a racially charged and pervasive and oppressive workplace environment that he removed his diplomas and other professional credentials from his office.

57.   His attempts at rectification and at ameliorating the adversarial and hostile work environment went nowhere, and he was retaliated against, for having complained about such discrimination, creating a hostile work environment for him, causing him emotional distress.

58.   With no viable alternative, Dr. Oppong was forced to decide not to renew his contract, but rather to give notice that he would not be renewing said contract, effective once his initial two-year contract was completed.

59.   In April 2022, Dr. Oppong informed OHMG that he would not be renewing his contract when it expired on August 1, 2022.

60.   Around April 2022 Dr. Oppong gave notice of his intent to end his employment with OHMG on August 1, 2022. **(Nonrenewal of OHMG Contract, Exhibit 12).**

61.   On August 31, 2022, Dr. Oppong contacted Leisa Allen to verify his vested 403b with Empower, as Empower did not have the correct time served, the fact that he was requesting a transfer of benefits, or the fact of his separation date on his 457 account. **(Contact to verify vested 403b with Empower, Exhibit 13).**

62.   Dr. Oppong's contract terms confirmed that he had completed two years of service and was qualified for full vestment.

63.   Leisa Allen responded that she would communicate with her contact within Empower and let Dr. Oppong "know what I hear." **(Response about 403b from Empower, Exhibit 14).**

64.    Dr. Oppong completed his contract on August 1, 2022.

65.    Dr. Oppong indicated that he would be filing an EEOC Complaint shortly.

66.    Dr. Oppong subsequently filed his complaint with the EEOC on December 16, 2022. **(EEOC Complaint filed, Charge NO. 474-2022-10444 Exhibit 15).**

67.    Dr. Oppong informed OHMG during an exit interview on July 19, 2022, that he would not recommend another physician of color to work at OHMG, and that OHMG should work on their diversity in the workforce. **(Exit Interview with OHMG, Exhibit 16).**

68.    Around the time that Dr. Oppong was departing the premises OHMG was recruiting another physician of color, Rachid Souleye, DO MPH. Upon information and belief, Dr. Souleye was given pretextual reasons for Dr. Oppong's resignation from OHMG.

69.    After Dr. Oppong completed his Exit Interview, Dr. Souleye reached out to Dr. Oppong and asked him for his honest assessment of the workplace environment at OHMG. Upon information and belief following this telephonic discussion, Dr. Souleye declined to work at OHMG. **(Complaint to Dr. Souleye, minority job candidate, about hostile work environment at OHMG, Exhibit 17).**

70.    It was at this juncture that OHMG, unbeknownst to Dr. Oppong, retaliated against him by not releasing his $20,000 benefits. **(Empower notice, Not Fully Vested, Exhibit 18).**

71.    Dr. Oppong communicated with Empower and was informed that his two-year employment at OHMG qualified him to 2022 fully vested, as determined by his hire date. However, per Empower, Dr. Oppong's paperwork did not specify any such schedule.

72.    Dr. Oppong subsequently contacted Leisa Allen on August 31, 2022, about his 403B transfer.    **(Communication about 403(B) transfer, Exhibit 19).**

73.    On or about September 1, 2022, Leisa Allen apprised Dr. Oppong that his 403B Qualified Retirement Plan was only vested for one year. **(Empower Notice, Vested for one (1) year, Exhibit 20).**

74.    On September 4, 2022, Dr. Oppong requested from Jennifer Roberts, who handled OHMG's Outpatient Clinic Operations, urgently requesting his official separation document stating fulfillment of his employment contract as well as the official vesting schedule for his 403(b) retirement plan with Empower.

75.    Dr. Oppong requested that the information be mailed to his home address in Utica, Kentucky.

76.    Thereafter, Dr. Oppong discovered that the required employer matching contributions to his 403B Qualified Retirement Plan had been rescinded.    **(Rescinded Contribution, Exhibit 21).**

77.    Divestment of $20K OHMG Contributions had apparently occurred.

78.    Attempts to amicably resolve the issue went nowhere.

79.    On September 7, 2022 via email, Dr. Oppong complained to Mark Marsh, CEO of Owensboro Health Regional Hospital (OHRH) & OHMG, about unfair treatment regarding vesting determination by OHMG Human Resources Department.  **(Complaint to CEO, Exhibit 22).**

80.    In early September 2022 Dr. Oppong informed Danny Hagan that he would be filing an EEOC Complaint shortly.

81.    Dr. Oppong applied for a physician position and was hired by UnityPoint/John Deere and began work on October 12, 2022. **(John Deere job offer, Exhibit 23, Ribbon cutting ceremony for UnityPoint/John Deere facility, Exhibit 24).**

82.    Dr. Oppong listed his home for sale in Kentucky and planned to relocate to Iowa to work at UnityPoint/John Deere hospital in Iowa.  **(MLS listing for sale of home, Exhibit 25).**

83.    Dr. Oppong stayed in a hotel temporarily while searching for housing Iowa, with a plan to remain permanently to work.  **(Hotel Stay in Iowa, Exhibit 26).**

84.    Dr. Oppong duly signed a lease agreement with Springs and Advance Property. **(Advance Property Lease, Exhibit 27).**

85.    Dr. Oppong obtained a badge for medical staff for UnityPoint and received compensation for start of his employment. **(Medical Staff badge, Exhibit 28, 2022 W-2, Exhibit 29).**

86.    However, due to the trauma he had experienced because of the hostile work environment at OHMG, working through the worst pandemic, he began to experience flashbacks.  Dr. Oppong hired a

moving company to relocate to Iowa for a new job but abandoned the employment at John Deere and returned home to Kentucky. **(Moving company contract, Exhibit 30; U-Haul rental, Exhibit 31; Payment for Apartment, Exhibit 32; Rental Storage Space in Iowa, Exhibit 33).**

87. Dr. Oppong therefore communicated with Unity Point to explain that he was reneging on the contract of employment. (**Communication to John Deere reneging job contract, Exhibit 34).**

88. Persons associated with OHMG continued to troll Dr. Oppong on LinkedIn. On December 9, 2022, Dr. Oppong was forced by the harassment to block Danny Hagan and Owensboro Health Hospital. **(LinkedIn contact by Danny Hagan from OHMG, Exhibit 35).**

89. Dr. Oppong, who was still subject to OHMG contract limitations, took a remote position in Louisville, Kentucky.

90. Due again to OHMG contract limitations, Dr. Oppong was forced to find office space in Caneyville, 53 miles away from his previous OHMG workplace.

91. Dr. Oppong sent an email to UnityPoint staff members Sarah Sullivan and Dr. John Rippentrop explaining why he was abandoning the contract. **(Complaint to hiring manager at John Deere, Dr. Rippentrop, about trauma caused by hostile work environment at OHMG, Exhibit 36).**

92. As a result of the hostile work environment and racial discrimination he experienced at OHMG, as well as the retaliatory

divestment of his earned employer contribution to his retirement benefits plan, he suffered when he complained about it, Dr. Oppong resolved never again to be employed by another hospital or organization to perform any clinical duties.

93.    As a result of the two years of racial discrimination that he experienced, as well as the continuing harassment based on his EEOC Complaint and the substantial loss of compensation due to the denial of partnership, Dr. Oppong hesitated to continue the lucrative contract with starting private practice.

94.    Dr. Oppong therefore returned to Owensboro to pursue his own practice.

95.    During September 2021, Dr. Oppong had communicated with Danny Hagan regarding the disparate treatment, hostile work environment and retaliation at OHMG. **(Complaints to Danny Hagan about unfair treatment by OHMG including HR and CEO related to Dr.Oppong's 403(B) specifically, and employment conditions in general, Exhibit 37).**

96.    In December 2022, Dr. Oppong filed a Charge of Discrimination and Retaliation with the Equal Employment Opportunity Commission ("EEOC"). **(EEOC Complaint, Charge NO. 474-2022-10444, See Exhibit 15).**

97.    Dr. Oppong stated in his Particulars that at OHMG, he was treated differently discriminatorily, had difficulty accessing

his flexible spending account, and was asked to backdate forms relating to his supervisory duties.

98.   Dr. Oppong further alleged in his EEOC Form 5 Particulars that he did not feel welcomed or comfortable working at OHMG.

99.   Dr. Oppong further alleged in his EEOC Form 5 Particulars that in or around April 2022, Dr. Oppong informed OHMG that he would not be renewing his contract when it expired on August 1, 2022.

100.   Dr. Oppong further alleged in his EEOC Form 5 Particulars that when he completed his exit interview or survey in July 2022, he indicated that he would not recommend another physician of color to work there and that OHMG should work on their diversity in the workforce.

101.   Dr. Oppong further alleged in his EEOC Form 5 particulars that in late August 2022 when he was transferring his retirement accounts to his new employer, he discovered that OHMG had withheld the $20,000 in employer contributions which had vested because he had fulfilled his contract terms.

102.   Dr. Oppong further alleged that when he demanded an explanation and a resolution, OHMG management falsely told him that the reason the funds had been withheld was because he had not fulfilled his two years of service contract. He was sure that the funds were withheld in retaliation for his having complained about

a racially discriminatory and hostile work environment for physicians of color.

103. Due to the trauma suffered from working at OHMG, Dr. Oppong pursued his private practice goals with Bluegrass Occupational and Environmental Health Consulting, in Caneyville, Kentucky.

104. On October 13, 2022, and again on October 18, 2022 Dr. Oppong made a payment to Springs at Bettendorf Apartments to pre-qualify for an apartment unit. **(Payment for Apartment, See Exhibit 32)**.

105. In **December 2022**, Dr. Oppong filed a Charge of Discrimination and Retaliation with the Equal Employment Opportunity Commission ("EEOC"), and OHMG, through counsel, responded with a Position Statement, which was dated **FEBRUARY 5, 2021**. **(Position Statement of OHMG, Dated FEBRUARY 5, 2021, Exhibit 38)**.

106. The Position Statement of OHMG comprised of eleven (11) pages before exhibits, which were all dated **FEBRUARY 5, 2021**, in an attempt to respond to Dr. Oppong's EEOC complaint, which was filed on **DECEMBER 16, 2022, (See Exhibit 38, pages 1-11)**. The OHMG response seemed arbitrary and capricious derived from the delivery date for their Position Statement and appears to be consistent with the manner Dr. Oppong was treated without regard while an employee at the hospital.

107. The Position Statement of OHMG, dated on **FEBRUARY 21, 2021,** almost two years before he filed the EEOC complaint on **DECEMBER 16, 2022,** seems consistent with the environment created by OHMG, which encouraged and fostered a hostile work atmosphere for Dr. Oppong due to his race. Such conduct was ongoing, open, and notorious. Simply put, racial discrimination is deeply embedded in OHMG. It is open, active, and unashamed. The harassment, abuse and discrimination are encouraged by OHMG management's refusal to stop the misbehavior and further displayed in their official response to the EEOC complaint.

108. On February 28, 2023, a Notice of Right to Sue letter was issued by the EEOC. **(EEOC Right to Sue Letter, Exhibit 39).**

## COUNT ONE --- RACIAL DISCRIMINATION

109. Paragraphs 1 though 88 are hereby incorporated by reference as if specifically set forth herein.

110. OHMG has engaged in racial discrimination in the terms and conditions of Plaintiff's employment including, but not limited to, Plaintiff's separation from employment with OHMG.

111. Such behavior actively and detrimentally disrupted Dr. Oppong's performance and professional growth and advancement.

112. The pervasive and continuing behavior and/or policies impeded Dr. Oppong's ability to perform his job because of the level of hostility and discomfort.

113. As a consequence of such ongoing harassment and disparate treatment by racial animus, Dr. Oppong felt such a racially charged and pervasive and oppressive workplace environment that he removed his diplomas and other professional credentials from his office.

114. OHMG was aware of the acts of hostility, and hostile work environment, and adverse actions, but did not investigate or take adequate steps to remedy the disparate treatment of Dr. Oppong.

115. Dr. Oppong contends that his supervisors treated him disparately and tried to stunt his professional development on account of his being Black and from Ghana.

116. They colluded in using their authority to systematically marginalize him and to unsuccessfully induce him to engage in unethical or unprofessional practices.

117. Dr. Oppong felt trapped in the role assigned to him at OHMG. His attempts at rectification and at ameliorating the adversarial and hostile work environment went nowhere, and he was retaliated against, for having complained about such discrimination, creating a hostile work environment for him, causing him emotional distress.

118. With no viable alternative, Dr. Oppong was forced to tender his resignation after his initial two-year contract was up.

119. During his two years at OHMG, Defendants created an environment which encouraged and fostered a hostile work environment for Dr. Oppong due to his race. Such conduct was

ongoing, open, and notorious. Simply put, racial discrimination is deeply embedded in OHMG. It is open, active, and unashamed. The harassment, abuse and discrimination are encouraged by OHMG management's refusal to stop the misbehavior.

120. African-Americans at OHMG were subjected to a stricter level of scrutiny than similarly situated white co-workers. African-Americans were repeatedly reprimanded and disciplined for relatively minor mistakes. The same behavior from similarly situated white employees was largely ignored even when discovered.

121. Such conduct by OHMG violates Title VII.

122. On or about December 16, 2022, Dr. Oppong filed a timely Charge of Discrimination alleging racial Discrimination with the Equal Employment Opportunity Commission ("EEOC"). (**A true and accurate copy of EEOC Charge of Discrimination #474-2022-01422 is attached hereto as Exhibit 15).**

123. Dr. Oppong has satisfied all statutory prerequisites for filing this action.

124. On or about February 28, 2023, Dr. Oppong received his "Dismissal and Notice of Rights" Letter from the EEOC for his Charge of Discrimination. **(A true and accurate copy of EEOC Dismissal and Notice of Rights for EEOC Charge of Discrimination #474-2022-01422 is attached hereto as Exhibit 39).**

125. Dr. Oppong has filed this action under Title VII within ninety (90) days after receipt of the "Notice of Right to Sue" Letter from the EEOC.

126. OHMG's discriminatory conduct, in violation of Title VII, has caused Dr. Oppong to suffer a loss of pay, benefits, and prestige.

### COUNT TWO --- HOSTILE WORK ENVIRONMENT

127. Paragraphs 1 though 121 are hereby incorporated by reference as if specifically set forth herein.

128. At OHMG, Dr. Oppong experienced APC contract issues with Ashley Flener, APRN, including backdated contract forms with Danny Hagan.

129. Dr. Oppong reported his concerns to appropriate supervisors at OHMG.

130. OHMG failed to take effective remedial action in response to racially charged complaints.

131. Instead, Dr. Oppong's complaints were treated with derision.

132. There was good reason for Dr. Oppong to expect continued hostility that would disrupt his performance at his workplace and also have a negative impact on his personal life.

133. OHMG is liable under Title VII for such harassment and discrimination because it knew, or should have known, of the racial

harassment and discrimination but failed to take prompt and effective remedial action. Instead, it did just the opposite. It condoned, ratified, and otherwise allowed the racially harassing and discriminatory behavior to continue.

### COUNT THREE --- RETALIATION

134. Paragraphs 1 though 129 are hereby incorporated by reference as if specifically set forth herein.

135. As a result of Dr. Oppong's good faith complaints and opposition to race discrimination and racial harassment, Defendant retaliated against Dr. Oppong by subjecting him to stricter scrutiny than his co-workers, to demeaning and hostile treatment, to wholly unwarranted negative performance feedback, to being subjected to unwarranted and having vested medical benefits as well as 403B divested.

136. OHMG's provision of pretextual or false derogatory information about Dr. Oppong's reasons for resigning his employment at OHMG amounted to "blacklisting" of a former employee. 29 C.F.R. 1980.102(a), and constituted retaliation.

137. OHMG provided this information because it was aware that Dr. Oppong was about to become a whistleblower and report certain violations of medical ethics and safety practices, and that Dr. Oppong had stated that he would not recommend OHMG as a suitable workplace for physicians of color.

138.   The Supreme Court has ruled that a broader range of actions can be considered an "adverse action" in the retaliation context, and that the "scope of the anti-retaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm." *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006).

139.   Dr. Oppong tried to resolve the workplace issues within the established chain of command, namely the practice manager, and then the director of clinical operations. When neither managerial employee was meaningfully helpful, Dr. Oppong was forced by the attendant circumstances to reach out to the CEO of OHMG as a last resort, yet to no avail.

140.   Accordingly, although the U.S. Supreme Court held in *Fort Bend County v. Davis*, __ U.S. ___, 139 S. Ct. 1843 (2019) that the requirement to file a charge of discrimination with the EEOC is not a jurisdictional prerequisite to a lawsuit under Title VII, but rather a non-jurisdictional mandatory claim-processing rule that is a precondition for relief, Dr. Oppong initiated a complaint to EEOC sounding in tort for violation of his statutory rights under Title VII.

141.   Dr. Oppong's Complaint was assigned Charge Number 474-2022-01422.

142.   Dr. Oppong asserted a Disparate Treatment Claim based on Race, and a Disparate Treatment Claim based on National Origin.

143. Dr. Oppong also asserted a Hostile Work Environment Claim.

144. Dr. Oppong felt that he had been improperly retaliated against for making complaints to management about the disparate treatment based on his race and national origin. Dr. Oppong's EEOC Complaint did not assert an actual Improper Retaliation Claim based on a prior or pending EEOC Complaint.

145. The kind of training procedures regarding work or personnel-related grievances given to Dr. Oppong during the course of his contract at OHMG consisted of training, retraining, for his job-specific role. Training covered professional conduct, mandatory modules for pathogen prevention, transmission, and things needed for daily operations.

146. However, in terms of Human Resources, Dr. Oppong simply went to Leisa Allen, and Practice Manager, Danny Hagan would normally follow up with Dr. Oppong after consulting with Human Resources.

147. OHMG was liable because it did not reasonably try to prevent and promptly correct the harassing behavior of Dr. Oppong's supervisor.

148. OHMG was liable because Dr. Oppong's supervisor responsible for harassment unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer, if any.

149. OHMG was liable for harassment by non-supervisory employees because it knew, or should have known about the harassment and failed to take prompt and appropriate corrective action.

150. Racial Discrimination Can Create a Hostile Work Environment.

151. OHMG failed to take any remedial action to stop the unwelcome behavior.

152. Taking adverse action for discussing compensation may implicate a number of different federal laws, whether the action is pursuant to a so-called "pay secrecy" policy or is simply discipline of an employee in an individual case.

153. Under EEOC-enforced laws, when an employee communicates to management to ask about compensation, or otherwise discusses rates of pay, the communication may constitute protected opposition under the EEO laws, making employer retaliation actionable based upon the facts of a given case.

154. When an employee experiences discrimination or retaliation at work it often takes the form of a significant action, such as a termination, demotion, or suspension, all of which clearly represent an "adverse employment action" under relevant anti-discrimination and retaliation laws.

155. However, as here, retaliation and discrimination can take subtler forms including a "death by a thousand cuts" approach.

26

**DAMAGES**

156. As a direct and proximate result of the Defendant's violations of his federally protected rights, Dr. Oppong has suffered:

      a) Economic damages for lost wages,

      b) Reputational harm,

      c) Mental suffering,

      d) Loss of enjoyment of life, and

      e) Emotional Distress.

157. Dr. Oppong is entitled to liquidated damages for the discrimination endured.

158. Dr. Oppong is entitled to an award of punitive damages against OHMG in an amount to be determined by a jury for the acts committed with malice or reckless disregard described in this Complaint.

**REQUEST FOR RELIEF**

Based upon all of the foregoing, Dr. Oppong requests:

I.    Process be issued and that Defendant OHMG be required to respond within the time provided by the Federal Rules of Civil Procedure;

II.   A jury be empaneled to try this case;

III. That Dr. Oppong be awarded compensatory damages for economic, non-economic, and reputational damages for Counts 1-3, in an amount to be determined by a jury;

IV. That Dr. Oppong be awarded punitive damages against Defendant OHMG for its reckless conduct for Counts 1-3 in an amount to be determined by a jury;

V. That Dr. Oppong be awarded reasonable attorneys' fees, costs, and litigation expenses;

VI. That Dr. Oppong be awarded pre-judgment and post-judgment interest on his damages; and

VII. For such other, further, and general relief as the Court deems just and appropriate.

The foregoing factual allegations are true to the best of my knowledge and belief.

Cletus Oppong, MD, MPH

Sworn and subscribed to me this ____24____ day of May, 2023.

Respectfully submitted,

Cletus Oppong, MD, MPH
2272 Meadowhill Lane
Utica, KY 42376
Home Phone:   678-510-3756
Email: cletus.oppong@gmail.com